[Civ. No. 3083. Third Appellate District.—March 12, 1926.]

# J. M. LONG, Respondent, v. ULMER MACHINERY CO., Appellant.

[1] CONTRACTS — SALE OF PUMP — INSTALLATION — CONSTRUCTION OF AGREEMENT.—Under an agreement for the purchase of a pump whereby the defendant agreed to furnish and install certain machinery so that the pump in question would have a capacity of delivering 360 gallons of water per minute from a distance of 230 feet below the surface, and whereby it was further agreed that in case the actual conditions were different from those stated in the contract and that additional expense was necessary to meet such conditions, said extra expense would be paid by the plaintiff, and whereby it was · still further agreed that "in case of any change or alterations in this agreement in the way of machinery or labor specified, and not furnished, or furnished and not specified, the regular price of same shall be added or deducted from the contract price, as the case may be," it is held in this case that the defendant undertook to install a pump and so install it that it would actually hoist water from plaintiff's well, and the capacity of the pump was to be such that from a distance of 230 feet below the surface, the pump would deliver 360 gallons per minute, and the delivery of water would be decreased in proportion to the distance of the water-level from the surface.

[2] ID.—MEANING OF INSTALLATION.—Installation means to place machinery in that position where it will reasonably accomplish the purposes for which it is set up.

[3] ID. — RESCISSION — PERFORMANCE — TIME — FINDING — EVIDENCE.—In an action for rescission of a contract for the furnishing and installation of a pump and gas engine, the finding of the trial court that a specified date was the time when the contract was to be completed was wholly immaterial, where the defendant pulled out its pumping plant prior to its ever having been installed, as the latter term must be construed and understood as found in the agreement where the defendant covenanted to install a pumping plant and failed to make any effort to properly install the same.

[4] ID.—PURCHASE OF PUMP AND ENGINE—FINDING.—In such action, the trial court did not err in finding that the agreement in relation to the purchase of the gas engine was in fact, though not in time, a part and parcel of the agreement for the furnishing and installation of a pump and that the parties intended a purchase and sale of the pump and engine as a single unit.

[5] ID.—TIME OF INSTALLATION OF PUMPING PLANT—EVIDENCE.—In such action, the alleged error of the trial court, if admitted to be error, in allowing testimony as to the time when the pumping plant should be installed, did not operate in a miscarriage of justice, where all the parties knew that the water was wanted for irrigation beginning with the opening of the irrigation season which was shown to be about coincident with the beginning of a specified month, and an additional one and one-third months were allowed to elapse after that date before notice of rescission was given.

(1) 35 Cyc., p. 188, n. 97.   (2) 32 C. J., p. 939, n. 10, 12, 13.
(3) 4 C. J., p. 1056, n. 79, p. 1057, n. 85; 35 Cyc., p. 158, n. 1.
(4) 35 Cyc., p. 116, n. 25.   (5) 4 C. J., p. 1172, n. 63.

APPEAL from a judgment of the Superior Court of Kern County. Erwin W. Owen, Judge. Affirmed.

The facts are stated in the opinion of the court.

Waldo E. Burford for Appellant.

C. V. Anderson and Wiley & Harvey for Respondent.

PLUMMER, J.—On the fifth day of December, 1922, the plaintiff and defendant entered into an agreement for the purchase and sale of a Johnson pump, which agreement is in the words and figures following, to wit:
"Agreement
for the sale, purchase and installation of Machinery and Electrical Equipment. Ulmer Machinery Co. (Inc.) of Porterville, Tulare County, California, party of the first part, and J. M. Long, of Bakersfield, in the county of Kern and state of California, party of the second part, do hereby agree upon the 5th day of December, 1922, as follows:
"The party of the first part agrees to furnish and install the following described machinery, on land belonging to the party of the second part, and situated W of Bakersfield in Kern Co., to-wit:
    1 Johnson pump complete as follows
    232'6" col shaft & tubing
    5–#10 HC vane stages
    1 Type F head
    20' suction
    installed ready for belt

"The party of the second part agrees to pay the party of the first part, or order, at their office in Porterville, California, for the above described machinery, and labor, the sum of two thousand fifty-three dollars ($2053.00) on the following terms:

"$500.00 cash with order

"$500.00 ninety days after installation

"Bal in 3 notes of $351.00 each due 6–9–&12 mon from installation respectively. Notes to bear 8% int per annum.

"Additions of engine to contract to be added to notes later.

"The party of the first part guarantees the above described pump to have a capacity to deliver approximately 360 gallons of water per minute from 230 feet below the surface to no feet above the surface, provided the well is straight and plumb, supply of water is ample and sand not excessive. Also, agrees to replace any defective parts for a term of two years when brought to their shop at Porterville.

"It is hereby agreed and understood by the said parties that in case actual conditions are different from those stated above, and that additional expense is necessary in order to meet such conditions, said extra expense shall be paid by the party of the second part. It is also further agreed that in case of any changes or alterations in this agreement in the way of machinery or labor specified, and not furnished, or furnished and not specified, the regular price of same shall be added or deducted from the contract price, as the case may be.

"It is also agreed that the above machinery is, and shall remain the personal property of the party of the first part, until all payments as above described, shall have been made in full, whether evidenced by note, book account or otherwise, and in case payments are not made in the amounts and at the same time as agreed, party of the first part shall have the right to remove the said machinery from whatever it may be located without process of law and retain all payments that have been made to apply as rental and damage to machinery; however the return of said machinery does not relieve the party of the second part from fulfilling the terms of this agreement.

"This agreement is contingent on delays caused by conditions beyond the control of the party of the first part, and does not become a contract until countersigned by an officer of the party of the first part."

On the same day and at the same time the plaintiff and defendant entered into a sales agreement, which agreement, so far as is necessary to be considered herein, is in the words and figures following, to-wit:

"Sales Agreement.<br>
"Town, Bakersfield, State, Calif.<br>
"Date 12/5, 1922.

"The following described property is hereby delivered by Ulmer Machinery Co., seller, to J. M. Long, buyer, on the following terms and conditions:

Kind of property: One Johnson Turbine Centrif. Pump.

Pump Head: Type F. No. of Stages, 5.

Size of Stages, 19 H. C.

Motive Power ............. Length of Column, 232.  Size of Column, 6 in

Switch Board ...............Belt (describe) .............

Accessories .......................................

for the purchase price of Two Thousand Fifty Three Dollars, payable as follows:

With order ...................................$500.00

Cash ninety days after installation (con)..........$500.00

Note payable.  Date June 5, year 1923; 8% per annum ...................................$351.00

Note payable.  Date Sept. 5; year 1923; 8% per annum ...................................$351.00

Note payable.  Date Dec. 5; year 1923; 8% per annum ...................................$351.00

Taken in part payment (name article) ..........$.......

Total................$2,053.00"

This agreement further provides that title shall remain in the seller until fully paid for, property to be kept in good condition by the buyer, in default of any payment, property to be returned to seller upon request and that the agreement for after payments is further evidenced by notes of even date therewith.

On or about the twelfth day of February, 1923, the plaintiff and defendant executed an additional writing or agree-

ment relating to the gas engine involved in this case. This agreement, so far as necessary to be considered, is as follows:

"Sales Agreement.

"Town, Porterville; State Calif.

"Date, Febry 12, 1923.

"The following described property is hereby delivered by Ulmer Machinery Co., seller, to J. M. Long, buyer, on the following terms and conditions:

Kind of property: 1 40 H P (sec. Hd) Fairbanks Morse Gasoline Engine

Pump Head .............. No. of Stages ..............

Size of Stages .............

Motive Power ............. Length of Column..........

Size of Column ............

Switch Board ............. Belt (describe) ..........

Accessories .......................................

for the purchase price of Four Hundred Seventy Two and 50/100 dollars, payable as follows:

Cash Note payable on or before Mar. 15, 1923......$112.50

Note payable. Date May 12th; year 1923, 8% per
    annum ...................................$120.00

Note payable. Date Aug 12th; year 1923, 8% per
    annum ...................................$120.00

Note payable. Date November 12th; year 1923, 8%
    per annum ...............................$120.00

Taken in part payment (name article).. .........$   .

Total...............$432.50"

This agreement further provides that the title shall remain in the seller until all of the notes are fully paid; that the buyer agrees to keep the property in good condition; that, upon default, the seller may take the property and all payments might be retained by the seller as compensation for rentals, etc. It appears from the transcript that the plaintiff had prior to December 5, 1922, installed or dug a well on certain lands and premises controlled by him, the water in which well stood at an elevation of about 232 feet from the surface; that the plaintiff and the defendant, after the plaintiff had finished digging the well in question, entered into negotiations concerning the purchase and installation of a Johnson pump and a gas engine

thereafter to be determined upon for the purpose of hoisting the water from said well and installing the same for irrigation purposes. The contracts entered into by the parties made no mention of the time when the installation of the pump and engine should be completed, but the circumstance that the water was wanted for irrigation purposes, and that the necessity for the use of the water would arise at the beginning of the irrigation season of the following year, to wit, some time along in March, was apparently well known to all the parties. The court admitted testimony to the effect that it was orally agreed that the installation should be completed by the first of March of the year 1923. It appears from the evidence that the pump was installed by the twenty-fourth day of February, 1923, and the engine referred to was placed in position ready for use on or about the nineteenth day of March, 1923. After the pump and engine were placed in position, as herein stated, the defendant tested the same for something like thirty minutes and was not able to raise any water from the well. The pump and engine not having been so installed as to enable plaintiff to hoist any water from the well, plaintiff notified the defendant on or about the tenth day of April, 1923, of the rescission of the contract, offered to deliver the pump and engine to the defendant, placed the same at the defendant's disposal, and demanded return of the payments made thereon, the surrender of the notes and also the return of certain personal property taken by the defendant as part payment for the Johnson pump. Thereafter and on or about the twentieth day of May, 1923, the defendant pulled out the pump from where it had been installed, but nothing further being done, on or about the twentieth day of June, 1923, the plaintiff began this action. Judgment was awarded the plaintiff as prayed for and the defendant appeals.

While there is some contradictory testimony in the record, we think it sufficiently appears that C. A. Moore, the defendant's district manager, who negotiated the agreements with the plaintiff and who testified as to the kind of pump, length of shafting and tubing necessary for successful operation, knew that the water in the well where the pump was to be installed stood at a point from 230 to 232 feet from the surface of the ground. The record shows that after

the shafting and tubing were withdrawn from the well, the rust marks on the suction pipe at the end of the column showed that the water-level was 18 inches below the lowest bowl, and, therefore, the pump would draw no water. As installed there were 232 feet of column, six feet for bowls and 22 feet of suction pipe. There were six bowls, one foot apart. The well itself was 315 feet in depth. According to the testimony, the bowls referred to must be submerged in order that the revolutions will force the water to the surface. The defendant, through its agent, had complete charge of the installation of the pump, but it does not appear anywhere in the transcript that any effort was made at any time to ascertain the water-level. This appears from the testimony of Mr. Moore, in answer to a question of what he knew concerning the length of column required, when negotiating for the sale of the pump. His answer to such question is as follows: ''Only guessing at what it would be by reason of the fact that no man could tell in an undeveloped country what would be necessary. It is impossible. No man could tell it; *it is just a guess*; I estimated and I thought that was about what it would take.'' This witness then testified that he was told by one Harry Lewis, not a party to the contract, that the water level was about 218 feet from the surface. This statement, however, is contradicted, and as we have said there is abundant testimony showing the defendant's agent had knowledge of the water-level as hereinbefore stated. After the installation of the pump and engine and the trial thereof without the successful hoisting of any water, it does not appear that defendant did anything to remedy the condition, although the plaintiff demanded that some such action be taken. At the conclusion of the trial the court made and filed its findings and the appellant assigns eleven grounds as to why the judgment should be reversed, among others, that some of the findings are not supported by the evidence, especially the finding that March 1st was fixed as the time when the installation of the pump and engine should be fully completed; also, that the court erred in permitting oral testimony as to conversations between the plaintiff and the defendant's agent of the date as to when the pump and engine should be installed and as to the fact that the defendant was to furnish the plans

and specifications, in order to determine the capacity of the pump necessary to hoist water from the well in question sufficient for irrigation purposes. Obligation is also urged to the fact that the court considered the agreement for the purchase of the pump and engine as really one transaction, although the papers were signed at different dates. From the view which we take of the agreements entered into between the parties, we think it unnecessary to pass upon the question as to whether the court erred in admitting testimony that March 1st was understood as the date by which time the pump and engine should be fully installed and ready for operation.

[1]  The appellant, in considering the agreement for the purchase of the pump, relies upon the fact that it actually furnished 232 feet of column, 5 #10 H. C. 8 vane stages; 1 type "F" head and 20 feet of suction pipe and that the pump in question had a capacity of delivering 360 gallons of water per minute from a distance of 230 feet below the surface, and that if it installed machinery capable of performing that service, it had completed its contract irrespective of whether the pump so installed would or would not hoist any water from the well in question. This reasoning is based upon the paragraph of the agreement hereinbefore first set out, wherein it is guaranteed that the pump furnished has such a capacity. In making this argument the appellant entirely overlooks the next following paragraph in the agreement wherein it is set forth that in case the actual conditions are different from those thus stated above, and that additional expense is necessary to meet such conditions, said extra expense shall be paid by the party of the second part. "It is also further agreed that in case of any change or alterations in this agreement in the way of machinery or labor specified, and not furnished, or furnished and not specified, the regular price of same shall be added or deducted from the contract price, as the case may be." In the light of this paragraph in the contract it is evident that it was the duty of the party furnishing the pump which it had agreed to install to ascertain the exact length of the column necessary in order to place the bowls in such a position in relation to the water-level that they would be properly installed so as to reasonably perform the services for which the installation was being had. It ap-

pears from the testimony that the plaintiff had no knowledge of the manner in which the pumping machinery would be installed; that it was necessary to have the bowls submerged in water to make their operation effective, but that the defendant and appellant did have such knowledge. It is further argued that no one can forecast the quantity of water that would be produced by the well and no one can guarantee that any pump would hoist a certain quantity of water from the well, but that is a different question entirely from the one which goes to the fact that it was the duty of the appellant in installing the pump to so install its machinery as to render it capable of actually hoisting water from the well. Reading the two paragraphs together which we are considering, we think they mean that the appellant undertook to install a pump and so install it that it would hoist water from the well belonging to the plaintiff, and that the capacity of the pump was such that from a distance of 230 feet below the surface, the pump would deliver 360 gallons per minute and that the delivery of water would be decreased in proportion to the distance of the water-level from the surface. It appears from the evidence that the pump in question had a lifting capacity of 252 feet. The appellant knew that the pump had to be installed in such manner that the revolving bowls should be submerged, and when it so performed its part of the contract that these bowls were left in the air above the water we do not very well see how it can be argued that installation, as that term is interpreted when applied to placing machinery in position, can effectively be claimed. [2] Installation means, as we understand the word, to place machinery in that position where it will reasonably accomplish the purposes for which it is set up. As defined in 32 C. J. 939 we find that "installation" includes all that we have just stated. The definition there given is as follows: "Installation, as applied to machinery, a word with a technical meaning, referring to the whole of a system of machines, apparatus and accessories set up and arranged for working, as in electric lighting, transmission of power, etc.," and to install means, "to set up or fix in position for use or service." To the same effect is the definition given in *Metzler* v. *Thye*, 163 Cal. 96 [124 Pac. 721], where a covenant in a lease to install an elevator was held to mean

that the elevator should be so installed as to be suitable for use.

[3] As the appellant pulled out its pumping plant prior to its ever having been installed, as we think that term must be construed and understood as found in the agreement where the seller covenanted to install a pumping plant and failed to make any effort to properly install the same, when it ascertained that no water could be raised by the pump as it had been set up and installed, the finding of the court as to March 1st being the time when the contract was to be completed is wholly immaterial. The record shows that the plaintiff did not take any steps toward rescinding the agreement or agreements until nearly a month and a half after that date and a considerable period of time after the appellant had made its alleged installation and apparently ceased to complete its work. It would appear from the testimony that when the pump was installed and the engine started up that the pumping machinery operated without any difficulty, showing that the well was sufficiently perpendicular for successful operation. The testimony of the appellant's witness who made the tests is as follows: "The pump was working, it was turning. . . . Probably tried the pump out for half an hour, and maybe a little more. . . . It didn't pump water during that period." The witness further testified as follows: "Q. Now, from any subsequent investigation made after that time, other than from the pulling of the pump, you are able to inform the court why the pump did not pump water? A. Yes. Q. Why not? A. Because the pump wasn't in the water. Q. Because the pump wasn't in the water? A. No, sir. Q. When you refer to the pump what do you mean? A. I mean the pump bowls. Q. It would have been necessary for the pump bowls to be submerged in the water in order to pump water? A. Yes."

[4] It is next urged that the court erred in finding that the agreement in relation to the purchase of the gas engine was in fact, though not in time, a part and parcel of the original agreement and that the parties intended a purchase and sale of the pump and engine as a single unit. The agreement dated December 5, 1922, contains the following: "Addition of engine to contract to be added to notes later." The testimony as to what was understood by this part of

the contract dated December 5th and that of the later agreement covering the engine is as follows: Mr. Moore, the district manager of the appellant, testified on that subject as follows: "Q. That engine referred to in this contract is the same engine that was referred to in this original contract, this original contract, which reads: 'Addition of engine to contract to be added to notes later,' that is the same one? A. Yes, sir. Q. That is intended to cover the obligation of the Ulmer Machinery Company in that contract in producing an engine? A. Yes. . . . Q. The engine described here then is not necessarily the engine described in defendant's exhibit 1? A. I don't know how it would be construed, this engine we purchased for Mr. Long as we agreed to do in the original contract, because there was no specification of the engine at first, just 'an engine.' Q. You had not agreed on what he should pay, what kind of an engine it should be? A. No. Q. That was to be determined later on? A. Yes, sir."

J. A. Ulmer, president of the appellant company, testified as follows:

"Q. Mr. Ulmer, how did you construe at the time this provision, 'addition of engine to contract to be added to notes later'? A. I construed that we were going to get an engine, I didn't know what size it would be, how much it would cost, or anything about it, I couldn't put it in the contract. Q. You expected to add that engine to this contract when you signed it? A. I expected to add it to the notes. Q. What did you intend by this language: 'addition of engine to contract'? A. I considered they wanted me to find an engine for them somewhere, I didn't know how big the engine was going to be, or how much it would cost; I couldn't put it in that contract because I didn't have the information at that time. Q. You didn't know what type of engine? A. Didn't know what type it was or what size, or what it cost. Q. For that reason it was not specifically described? A. It wasn't described and the price wasn't on there. Q. If you had had an engine at that time for the purpose of describing it, it would have been described? A. If I was selling an engine at a certain specified price, knew what kind of an engine they were going to have, I would have put that in. Q. In this first contract in lieu of that it provided that the engine should in the future

be added to the contract? A. The price would be added to the contract, which was done in that third contract. Q. This contract was drawn by your agent, wasn't it? A. Mr. Moore. Q. Mr. Moore? A. Yes, sir. Q. That is his handwriting in there? A. Yes, sir. Q. Why did it not state then that it was simply to be added to the price, or the amount of said bill, instead of that it was to be added to the contract? A. Added to the price. Q. Yes. A. The price and contract are the same thing. Q. Not necessarily. A. I would think so. Q. Why was it necessary in the contract to state further it was to be added to the notes later if the contract and the price are the same? A. Why? Q. Yes. A. Because I didn't know the price at that time, I didn't know what engine I was going to get, I couldn't add the price at that time because I didn't know anything about what the price was, or the make of the engine, or where it was to come from, or anything else.''

There was some other testimony along the same line but it is no different in effect from that herein set forth.

[5] Without passing, as we have said, one way or the other upon the alleged error of the court in admitting testimony as to the time when the pumping plant should be installed, we think that section 1657 of the Civil Code, which provides if no time is specified for the performance of an act required to be performed, a reasonable time is allowed, would bring this case within the provisions of section 4½ of article VI of the constitution of the state, when the circumstances surrounding the contracting parties are taken into consideration. All the parties knew that the water was wanted for irrigation beginning with the opening of the irrigation season of 1923, which the testimony shows to be about coincident with the beginning of the month of March, and in view of the fact that an additional one and one-third months were allowed to elapse after that date before notice of rescission was given, the alleged error of the court, if admitted to be error, has not operated in a miscarriage of justice. The testimony which we have set forth, we think, justified the court in coming to the conclusion that the parties contemplated the purchase and sale of a pump and engine as a single unit. If this is not true, then the words concerning the engine and the addition of the purchase price contained in the agreement dated De-

cember 5, 1923, become meaningless. What we have said also disposes of the appellant's cross-complaint for the notes alleged to be due at the time of the beginning of this action. We think the judgment should be affirmed, and it is so ordered.

Hart, J., and Finch, P. J., concurred.